Argued February 18, affirmed April 15, 1971

OREGON TELEPHONE CORPORATION,
*Appellant, v.* PUBLIC UTILITY COM-
MISSIONER, *Respondent.*

483 P2d 822

*R. L. Marceau*, Bend, argued the cause for appellant. With him on the brief were McKay, Panner, Johnson, Marceau & Karnopp, Bend.

*Richard W. Sabin*, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief was Lee Johnson, Attorney General, Salem.

Before Schwab,* Chief Judge, and Foley and Fort, Judges.

FORT, J.

The defendant Commissioner by order directed the plaintiff utility to account for the sum of $30,000 paid to it and other named payees by Pacific Northwest Bell Telephone Company, or, in the alternative, to ask for a hearing in connection therewith. Plaintiff so requested. Following the hearing the Public Utility Commissioner entered an order requiring the plaintiff to account for the $30,000. Plaintiff duly sought review of that order in the circuit court. That court sustained the ruling of the Commissioner. Plaintiff in this court assigns as sole error the absence of substantial evidence to support the Commissioner's order.

Plaintiff is a small utility serving approximately 1,000 telephone stations located in eastern Oregon. It was basically a family enterprise and the great bulk of its stock was owned by members of the Robert Damon family. Its telephone plant in service in 1966

---

* Schwab, C. J., did not participate in this decision.

exceeded $750,000 in value. James Damon served as president and owned 26.5 percent of the stock. His father, Robert Damon, owned 29.1 per cent. His mother, Helen Damon, served as secretary, and she, together with a daughter and the latter's husband, owned virtually all the rest. Only three per cent of its 275 shares of outstanding common stock was owned by others. In 1964 Oregon Telephone Corporation entered into a contract with Harney Telephone Cooperative, Inc., for the operation and management of Harney by Oregon Telephone Corporation for a 25-year period. The contract provided that if both Damons ceased to be involved in the active management of Oregon Telephone Corporation, Harney at its option could cancel the agreement on six-months' notice.

In March 1966, plaintiff, Harney and Pacific Northwest Bell Telephone Company entered into an Assignment and Termination of Operating Agreement whereby Pacific Northwest Bell Telephone Company agreed to provide telephone service in lieu of Harney and also agreed to purchase Oregon Telephone Corporation's interest in the 1964 operating agreement described above between Harney and plaintiff.

The 1966 agreement included the following provision:

"1. In consideration of the payment of the sum of $30,000 by Purchaser to the Operating Company and the Damons, jointly, which payment shall be made promptly after the effective date of this Agreement, the Operating Company and the Damons, jointly and severally, do hereby assign, transfer and set over to Purchaser all of their right, title and interest in and to the Operating Agreement."

Pacific Northwest Bell Telephone Company de-

livered its check for $30,000 made payable jointly to "Oregon Telephone Company, Robert Damon, James W. Damon and Roy Kilpatrick." The check was endorsed by each payee, James Damon endorsing it both as president of Oregon Telephone Corporation and personally. No part of the proceeds of the check was actually deposited or applied to the credit of Oregon Telephone Corporation. The sum of $13,500 was paid to Robert Damon and a like amount to James Damon personally. The remainder was retained by Mr. Kilpatrick as attorney fee.

Neither. Robert Damon nor James Damon are parties to this proceeding. It is conceded by plaintiff, however, that both fall within the definition of an " 'affiliated interest' with a public utility" as defined in ORS 757.015.

ORS 757.170 (1) provides:

"No public utility doing business in this state shall make or contract to make any payment, directly or indirectly, to any person or corporation having an affiliated interest, for service, advice, auditing, accounting, sponsoring, engineering, managing, operating, financing, legal or other services, or enter any charges therefor on its books, which shall be recognized as an operating expense or capital expenditure in any rate valuation or any other hearing or proceeding, until the propriety and reasonableness of any such payment, or contract for payment, has been submitted to and approved by the commissioner."

It is further conceded that neither the $30,000 payment nor the 1966 contract were ever submitted to or approved by the Public Utility Commissioner. Plaintiff contends that it is not required to do so because the $30,000 payment was not in fact made to it nor

was it for its use and benefit. It contends that the $30,000 was paid by Pacific Northwest Bell to James Damon to compensate him for the loss of future earnings which he would have earned from Harney under the 1964 contract during the remaining 23 years it had yet to run when it was terminated by the 1966 agreement. Plaintiff conceded in oral argument before this court that "Robert Damon at this time was probably out of it as far as any realistic possibility of managing even if the take-over had not taken place." The record shows that he was 72 at the time of the hearing. It in effect contends if James Damon saw fit to split with his father, Robert Damon, the $27,000 left after the attorney fee, that was up to them.

As previously noted, the 1964 contract was between Oregon Telephone Corporation and Harney. Neither of the Damons were parties to it personally. Nevertheless, though conceding both in its brief and in oral argument that under that agreement

"* * * there is evidence that Oregon Telephone would have achieved some operating economies * * *",

plaintiff stated in oral argument:

"* * * [T]hose economies would have been absorbed, we submit, by the rate-making process to the extent operating economies would have been achieved by Oregon Telephone, their return on investment would have been adjusted by decreases, presumably, in the rate structure in the rate-making process."

That argument is one to be addressed to the sound discretion of the defendant. The purport of the Commissioner's order simply is that plaintiff must record on its books the $30,000 payment. It makes no attempt to determine the merit or extent of the claims

of James or Robert Damon thereto, or those of Oregon Telephone Company.

Here the appellant, though it is named as a payee of the $30,000 both in the contract and in the check, takes the anomalous position that it has no interest in it, that the full amount belongs to a person—its own president—who is not only in a fiduciary relationship to it but is also an "affiliated interest" within the statute as an officer, a director, and a major stockholder. ORS 757.015.

■ A primary responsibility of the Public Utility Commissioner is the protection of the rate payer. In determining rates, and, more particularly, what constitutes a reasonable rate of return to a utility, the Commissioner is required to "value all the property of every public utility" (ORS 757.055) and is given

"(1) * * * the right and power of regulation, restriction and control over the budgets of expenditures of public utilities, as to all items covering:
"* * * * *
"(f) Any payment or contemplated payment to any person or corporation having an affiliated interest for service, advice, auditing, associating, sponsoring, engineering, managing, operating, financing, legal or other services.
"* * * * *." ORS 757.105.

■ In so doing, it is obvious he must consider all assets as well as liabilities of the utility. It is thus his duty to see that all such are properly accounted for in the books of the company. ORS 757.120.

■ In discharging his duties under ORS 757.170, we think it clear that the Commissioner, on the evidence here, was required to order the entry of the payment of the $30,000 on the books of plaintiff. Whether in

subsequent proceedings he may or may not approve payment of all or any part of the $30,000 to either or both of the Damons is not here involved. The statute clearly requires that payment to an affiliated interest, whether made directly by the utility or pursuant to a contract to which it is a party, must first be "submitted to and approved by the commissioner." ORS 757.170 (1).

The judgment is affirmed.